IN THE UNITED STATES DISTRICT COURT 09 CV 914
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK ADAMS, individually and on behalf of all others similarly situated, | No. |
| Plaintiff, | |
| v. | ECF CASE |
| BANK OF AMERICA CORPORATION, KENNETH D. LEWIS, JOE PRICE, O. SLOAN III, THOMAS RYAN  DONALD STEWART, JACKIE WARD, THOMAS MAY, MEREDITH SPANGLER, WALTER MASSEY, CHARLES GIFFORD, GARY COUNTRYMAN, WILLIAM BARNET III, ROBERT TILLMAN, FRANK BRAMBLE SR., PATRICIA MITCHELL, NICHOLAS RETSINAS, THOMAS MENINO, PATRICK LEE, MONICA LOZAN0, TOMMY FRANKS,  THE BANK OF AMERICA CORPORATION CORPORATE BENEFITS COMMITTEE, J. STEELE ALPHIN, AMY WOODS BRINKLEY,, AND JANE DOES 1-20, |  |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff Mark Adams ("Plaintiff"), a participant in the Bank of America 401(k) Plan

("the Plan"), on behalf of himself and all others similarly situated, alleges the following based

upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and

belief as to all other matters based on, among other things, the investigation conducted by and

through Plaintiff's attorneys, which included, among other things, a review of the following

material:  (a) Form 5500 filings with the Department of Labor ("DOL"); (b) Form 11-k filings

with the Securities and Exchange Commission ("SEC"); (c) other filings with the SEC; (d) press

releases, news reports, transcripts of conference calls with securities analysts; (e) other publicly

available news reports; and (f) and a review of available documents governing the operations of

the Plan. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Securities Act ("ERISA), 29 U.S.C. § 1132, against the Plan's fiduciaries, on behalf of participants in and beneficiaries of the Plan.

2.    The Plan is a defined contribution plan sponsored by The Bank of America Corporation (the "Company" or "Bank of America").

3.    Throughout the Class Period (September 15, 2008, through the present), the Plan held substantial interests in the stock of The Bank of America Corporation ("the Company," or "Bank of America"). Plaintiff held shares of Bank of America stock in his Plan account during the Class Period.

4.    Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

5.    Plaintiff alleges that Defendants allowed the imprudent investment of the Plan's assets in Company Stock throughout the Class Period despite the fact that (i) in an act of serious mismanagement, the Company chose to acquire Merrill Lynch & Co., Inc. ("Merrill Lynch") in an all-stock transaction valued at approximately $50 billion (the "Acquisition"), which was approved by shareholders on December 5, 2008; (ii) after the announcement of the Acquisition, Defendant Kenneth D. Lewis ("Lewis") and others repeatedly disseminated material misstatements concerning both the state of Bank of America, and the state of Merrill Lynch, to employee Plan participants; (iii) after the Acquisition, Defendant Lewis and the other Defendants

failed to disclose the disastrous state of Merrill Lynch's financial condition and did not disclose the significant risks and liabilities that Bank of America and its shareholders would be assuming by acquiring Merrill Lynch; (iv) Defendants failed to disclose that the Company had considered withdrawing from the Acquisition prior to closing and only agreed to consummate the Acquisition when the federal government agreed to provide assistance to Bank of America; (v) when the true facts regarding Merrill Lynch's dire financial condition and its devastating impact on Bank of America began to emerge,  Bank of America Stock plunged 50%  from a closing price of $10.20 per share on January 14, 2009 to a closing price of $5.10 per share on January 20, 2009.  Since the start of the Class Period, Bank of America stock has dropped by 80%, causing hundreds of millions of dollars in losses to the Plan and its participants.

6.     Plaintiff alleges in Count I that the Defendants, with responsibility for investing the Plan's assets, breached their fiduciary duties to the Plan's participants in violation of ERISA by failing to prudently and loyally manage the Plan's investment in Bank of America stock.  In Count II, Plaintiff alleges that the Defendants, who were responsible for the selection, monitoring and removal of the Plan's other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate.  In Count III, Plaintiff alleges that the Defendants, with knowledge of the risks associated with Company stock, breached their duty to disclose necessary information to co-fiduciaries.  In Count IV, Plaintiff alleges that Defendants, who communicated with participants regarding the Plan's assets, or had a duty to do so, failed to provide participants with complete and accurate information regarding Bank of America stock sufficient to advise participants of the true risks of investing their retirement savings in the stock.  In Count V, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent

breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring. Finally, in Count VI, Plaintiff states a claim against Bank of America for knowing participation in the fiduciary breaches alleged herein.

7.     As Bank of America, Defendant Lewis and the other fiduciaries knew or should have known, the acquisition of Merrill Lynch was far riskier than the Plan's participants could have known. Prior to the Acquisition, Bank of America had weathered the subprime and credit crisis reasonably well in comparison with other banks – largely because Bank of America had exited the subprime market years ago and therefore suffered no direct losses from subprime lending. Nonetheless, the Company had some exposure to Collateral Derivative Obligations ("CDOs"), which are investment products often backed by subprime loans, and hence experienced large write-downs in the value of its CDOs in the last quarter of 2007. Even with these write-downs of over $5 billion, the Company booked about $15 billion in profits in 2007. All that would change drastically with the Acquisition.

8.     Notwithstanding a barrage of positive and materially misleading statements from the Company and Defendant Lewis, the true facts about Merrill Lynch's financial condition and the severity of its negative impact on Bank of America are only now becoming known to the market and to Plan participants, and they are devastating. On January 16, 2009, investors learned that the Company would receive a $20 billion dilutive investment in preferred stock from the federal government and a guarantee against future losses on $118 billion in toxic assets, mostly coming from Merrill Lynch. On the same day, the Company announced fourth quarter losses of $1.79 billion, and a shocking $15.31 billion fourth quarter net loss at Merrill Lynch. As a result, analysts now believe that Bank of America will need to raise an additional $80 billion to restore adequate liquidity. These revelations caused a dramatic 50% drop in the value of

Company stock during the week of January 14, 2009 to January 20, 2009, and were a direct result of the ill-conceived Acquisition.

9.      This action is brought on behalf of the Plan and its participants and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

10.     As a result of Defendants' fiduciary breaches, as enumerated and described herein, the Plan has suffered substantial losses, resulting in the depletion of hundreds of millions of dollars of the retirement savings and anticipated retirement income of the Plan's participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

11.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.  Plaintiff also brings this action as a participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

12.     Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend the

Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the Counts alleged herein.

## II.    JURISDICTION AND VENUE

13.    **Subject-Matter Jurisdiction.** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject-matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject-matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the ... laws ... of the United States." 28 U.S.C. § 1331.

14.    **Personal Jurisdiction.** ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them.

15.    **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because Defendant Bank of America is found in this district.

## III.    PARTIES

### A.    Plaintiff

16.    Plaintiff Mark Adams is a "participant" in the Plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7). He continues to hold shares of Company stock in his retirement account in the Plan and did so throughout the Class Period.

### B.    Defendants

17.    The Defendants are identified below. All of the Defendants are fiduciaries of the Plan within the meaning of ERISA, as is explained below in Section V ("Defendants' Fiduciary Status"), and all of them breached their fiduciary duties in various ways as is explained in Section X ("Claims for Relief").

18.    Defendant **Bank of America** is a Delaware corporation that is headquartered at 401 N. Tryon Street, Charlotte, NC 28255.   The Company provides a diverse range of banking and nonbanking financial services and products domestically and internationally.  Bank of America's common stock is listed on the New York Stock Exchange and trades under the ticker symbol "BAC."  As described more fully below, the Company was a fiduciary for the Plan.

19.    **Defendant Kenneth D. Lewis ("Lewis")**, is, and at all relevant times was, the Chairman of the Board of Directors and Chief Executive Officer of Bank of America.  As is explained in more detail below, in addition to his monitoring obligations as a member of the Board of Directors, Defendant Lewis engaged in acts of Plan administration by communicating extensively with employees regarding the Company and Company stock, the single largest asset of the Plan.

20.    **Bank of America Corporation Corporate Benefits Committee (the "Benefits Committee" or "Committee") Defendants**.  The Benefits Committee is the plan administrator, and has overall responsibility for the operation and administration of the Plan.  The Benefits Committee members are therefore fiduciaries of the Plan.  The Defendants identified in this paragraph are sometimes referred to as the "Benefits Committee Defendants" or the "Committee Defendants."  On information and belief, the Benefits Committee during the Class Period included the following persons:  **J. Steele Alphin** ("Alphin"), who is also Chief Administrative Officer of the Company; **Amy Woods Brinkley** ("Brinkley"), who is also the Company's Chief Risk Officer, and John and Jane Does 1-10, who will be added as Defendants when their identities are revealed to Plaintiff.

21.    **Director Defendants.**  As explained in more detail below, the Company's Board of Directors had certain responsibilities with respect to the Plan, including appointment and

oversight responsibilities. The Board and its members were therefore fiduciaries of the Plan. The Defendants identified in this paragraph are referred to as the **"Director Defendants,"** and, on information and belief, include all of the Board members during the Class Period: (i) **Defendant Lewis**, Executive Chairman and Chief Executive Officer; (ii) Chief Financial Officer **Joe Price** ("Price"); (iii) **O. Sloan III** ("Sloan"), Lead Director, Chairman of Executive Committee and Chairman of Compensation and Benefits Committee; (iv) **Thomas Ryan** ("Ryan"), Director and Member of Compensation and Benefits Committee; (v) **Donald Stewart** ("Stewart"), Managing Director, Principal Officer and Chairman of Banc of America Securities Canada Co., (vi) **Defendant Brinkley**, Chief Risk Officer of Bank of America; (vii) **Jackie Ward** ("Ward"), **Thomas May** ("May"), **Meredith Spangler** ("Spangler"), **Walter Massey** ("Massey"), **Charles Gifford** ("Gifford"), **Gary Countryman** ("Countryman"), **William Barnet III** ("Barnet"), **John Collins** ("Collins"), **Robert Tillman** ("Tillman"), **Frank Bramble Sr.** ("Bramble"), **Patricia Mitchell** ("Mitchell"), **Nicholas Retsinas** ("Retsinas"), **Thomas Menino** ("Menino"), **Patrick Lee** ("Lee"), **Monica Lozano** ("Lozano"), and **Tommy Franks** ("Franks").

## IV.   THE BANK OF AMERICA 401(K) PLAN

### A.   Background

22.    The Bank of America 401(k) Plan (the "Plan") is an "employee pension benefit plan," as defined by §3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), and, further, is a "defined contribution plan" within the meaning of ERISA §3(34) of ERISA, 29 U.S.C. § 1002(34). The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA §409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

23.     The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in a trust fund administered by Bank of America, N.A.

24.     The Plan, as amended and restated effective January 1, 2006, has as its purpose "to provide a program through which Participants may achieve additional financial security during their working years and in retirement and participate in the growth of the Participating Employers through ownership of Common Stock" in the Company.

25.     "Participating Employers" include the Company and its Subsidiaries, and "Covered Employees" include any U.S.-based person who is identified as an Employee in the personnel records of his or her Participating Employer.

26.     All Covered Employees are eligible to make pre-tax contributions as soon as they are employed by a Participating Employer.

27.     The Plan purports to consist of two components: the Employee Stock Ownership Plan (the "ESOP") portion, and the "Profit-sharing portion."  The ESOP consist of the Common Stock Fund, and purports to qualify as an ESOP within the meaning of ERISA § 407(d)(6).  The "Profit-sharing portion" is defined as "the portion of the Plan that is not the ESOP."

28.     An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities."  29 U.S.C. § 1107(d)(6)(A).  On information and belief, the ESOP component of the Plan does not satisfy all the statutory and regulatory mandates with respect to ESOP design and/or operation.

29.     Even if the ESOP component of the Plan satisfies all the statutory and regulatory mandates and hence qualifies as an ESOP, fiduciaries of an ESOP remain bound by core ERISA

fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

30.    Accordingly, if the fiduciaries knew or an adequate investigation would have revealed that BAC stock was no longer a prudent investment for the Plan, the fiduciaries were required to disregard plan direction to maintain investment in BAC stock and to protect the Plan's assets by investing those assets in other, suitable investments.

**B.    Participant and Employer Contributions to the Plan**

31.    Individual accounts are maintained for each Plan participant.  Participants' accounts are credited with Employer and Participant-directed contributions and earnings, expenses, gains and losses.

32.    Throughout the Class Period, participants in the Plan were permitted to defer a percentage of their base compensation for investment in the Plan.  Effective January 1, 2006, Plan participants are allowed to contribute between 1% and 30% of their compensation, up to the annual maximum permissible under the Internal Revenue Code.

33.    The Company provides a Matching Contribution for all employees who have completed 12 months of service.  Any pre-tax employee contributions made prior to completing 12 months of employment are not eligible for the Matching Contribution.

34.    Effective January 1, 2006, the Company Match was calculated in each payroll period as *the lesser of* (A) the full amount of the Participant's pre-tax Employee Contribution for the payroll period *or* (B) five percent of the Participants' compensation for the payroll period. An annual "true-up" Matching Contribution was available under certain circumstances to ensure that Participants received the lesser of (A) the full amount of their pre-tax contributions for the year or (b) five percent of their annual compensation.

35.     Plan participants are authorized to direct the investment of their contributions and the Company Matching Contributions among the various investment options in the Plan.

**C.     Investment options in the Plan, including the BAC Common Stock Fund**

36.     The Plan provides that the "Funds for Investment" include the Common Stock Fund. The Common Stock Fund "shall be invested primarily in Common Stock" of the Company.

37.     At all relevant times, the Common Stock Fund has been an available investment vehicle for Plan funds, and has been invested almost exclusively in BAC stock.

38.     As of January 1, 2006, available investment options for Participants also included a Stable Capital Fund and 17 mutual funds.

**D.     Losses to the Plan**

39.     The Plan has incurred substantial losses as a result of the Plan's investment in BAC common stock. According to the most recent available information, as of December 31, 2007, the Plan held about 75 million shares of BAC common stock, then having a market value of approximately $3 billion. *See* The Bank of America 401(k) Plan, Annual Report (Form 11-K) for the Year Ended December 31, 1007 (June 6, 2008) (hereinafter the "2007 Form 11-K"). Following the Company's ill-fated decision to engage in the Acquisition, BOA common stock has collapsed. The price of BOA stock has dropped from over $26 at the beginning of the Class Period to $5.10 on January 20, 2009 before recovering slightly, and hence the Plan has lost hundreds of millions of dollars. These staggering losses could have been avoided in whole or in part had the Plan fiduciaries acted prudently, loyally and in the best interest of Plan participants as required by ERISA.

## V.   DEFENDANTS' FIDUCIARY STATUS

### A.   The Nature of Fiduciary Status

40.   **Named Fiduciaries.** Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

41.   **De Facto Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

42.   Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants and beneficiaries under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

43.   As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

44.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below the claims against each Defendant are based on such specific discretion and authority.

45.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, Bank of America chose to assign the appointment and removal of fiduciaries to the monitoring Defendants named herein. These persons and entities in turn selected Bank of America employees, officers and agents to perform most fiduciary functions.

46.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.    Bank of America's Fiduciary Status**

47.     Bank of America had the responsibility to appoint, and hence to monitor and remove, the Trustee, and, on information and belief, to execute the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Plan.

48.     On information and belief, the Company exercised *de facto* authority and control with respect to the *de jure* responsibilities of the Committee Defendants, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing plan documents to those Defendants, without relieving them of any such responsibility.

49.     On information and belief, in order to comply with ERISA, the Company and the Committee exercised responsibility for communicating with participants regarding the Plan in a

plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA. *See, e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description or "SPD"). In this regard, the Company and the Committee disseminated the Plan's documents and related materials which, among other things, incorporated by reference Bank of America's misleading SEC filings, thus converting such materials into fiduciary communications.

50.     Moreover, Bank of America, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan, including the Committee Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Bank of America is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

51.     Finally, under basic tenets of corporate law, Bank of America is imputed with the knowledge that the other Defendants had regarding the misconduct alleged herein, and, hence, like the fiduciaries who acted on its behalf, had knowledge of the imprudent actions alleged herein.

52.     Consequently, in light of the foregoing duties, responsibilities, and actions, Bank of America was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

010103-11 282923 V1

C.    **Defendant Lewis's Fiduciary Status**

53.    According to the 2007 Form 11-K, the Board appointed the members of the

Committee. Thus, the Board had a duty to monitor the activities of the Committee, and as such

under ERISA was required to ensure that the Committee was fully informed of critical

information that it needed to faithfully discharge its duties under ERISA. As a member of the

Board, Defendant Lewis had and exercised this authority.

54.    In addition, throughout the Class Period, Defendant Lewis made numerous

statements, many of which were incomplete and inaccurate, to employee Plan participants

regarding the Company, and future prospects of the Company specifically with regard to the risk,

or purported lack thereof, faced by the Company as a result of the Acquisition of Merrill Lynch.

One method for disseminating these statements was via internal "talking points" disseminated to

employee-Plan participants. These statements were made in an ERISA fiduciary capacity

because they contained information about the likely future of the Plan's benefits, in particular the

value and prudence of the Plan's largest single investment, Bank of America stock, and, thus

were acts of Plan administration under controlling legal precedent. Lewis made these statements

knowing that, due to his position as CEO, employees would view him as a fully informed,

knowledgeable and trustworthy source of information regarding Bank of America's financial

condition and future prospects.

55.    Consequently, in light of the foregoing duties, responsibilities and actions as a

member of the Board, and as a result of his communications with the Plan's participants which

constitute acts of Plan administration, Defendant Lewis was a *de facto* fiduciary of the Plan

within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that he

exercised discretionary authority or discretionary control respecting management of the Plan,

exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**D.    Committee Defendants' Fiduciary Status**

56.    The Plan names the Committee to act as the Plan "administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). The Committee and its members are therefore named fiduciaries.

57.    According to the Plan, the Committee has "complete responsibility for the operation and administration of the Plan ... excluding those areas specifically or by necessary implication allocated in the Plan to the Compensation Committee, the Trustee or the Board of Directors."

58.    In addition to its general "powers necessary to enable it properly to carry out its duties under the Plan and Trust," the Committee had the specific powers and duties, among others, to:

(i)     construe and interpret the Plan and to determine all questions that arise thereunder;

(ii)    decide all questions relating to the eligibility of Employees to participate in the Plan as well as to receive benefits under the Plan;

(iii)   establish rules and procedures relating to Participant elections under the Plan, including Compensation reduction elections under Article IV, Distribution elections under Article VII and investment elections under Article XII, and the Committee in its discretion may employ one or more persons or entities to provide advice or other assistance to Participants in making their said investment elections;

*    *    *    *

(v)      authorize all disbursements by the Trustee except for the ordinary expenses of administration of the Trust;

*      *      *      *

(xi)     modify or supplement any Plan accounting method, practice or procedure, make any adjustments to Accounts, authorize special contributions, or modify or supplement any other aspect of the operation or administration of the Plan in such manner and to such extent consistent with and permitted by [ERISA] and the [Tax] Code that the Committee deems necessary or appropriate to correct errors and mistakes, to effect proper and equitable Account adjustments or otherwise to ensure the proper and appropriate administration and operation of the Plan; and

(xii)    carry out such other and further specific duties, and exercise such other and further specific powers, authority and discretion, as are elsewhere in the Plan or the Trust either expressly or by necessary implication conferred upon it.

59.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

E.      **Board of Directors' Fiduciary Status**

60.     According to the 2007 11-K for the Plan, the Board of Directors "has the right at any time to remove any member of the Committee." On information and belief, the Board of Directors also appoints the members of the Committee.

61.     Accordingly, the Board of Directors had a duty to monitor the members of the

Committee, 29 C.F.R. § 2509.75-8 at FR-17 ("At reasonable intervals the performance of

trustees and other fiduciaries should be reviewed by the appointing fiduciary...."), and exercised

a fiduciary function under ERISA, 29 C.F.R. § 2509.75-8 (D-4).

62.     Consequently, in light of the foregoing duties, responsibilities, and actions, the

Board of Director Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA

§ 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary

authority or discretionary control respecting management of the Plan, exercised authority or

control respecting management or disposition of the Plan's assets, and/or had discretionary

authority or discretionary responsibility in the administration of the Plan.

## VI.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2)

and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of

persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at
> any time between September 15, 2008, and the present (the "Class
> Period") and whose Plan accounts included investments in
> Company stock.

Excluded from the Class are Defendants, the officers and directors of the Company at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or

assigns and any entity in which Defendants have or had a controlling interest.

64.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the

Class.

65.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

and can only be ascertained through appropriate discovery, Plaintiff believes there are tens of thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period. Indeed, according to the Plan's Form 5500 for 2007, there were over 200,000 Plan Participants as of the beginning of that year.

66.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants acted as fiduciaries;

(b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan, and the Plan's participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the Plan and, therefore, members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.     Plaintiff's claims are typical of the claims of the members of the Class because the Plan, as well as the Plaintiff and the other members of the Class, each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of

adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

70.     Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII.    SUBSTANTIVE ALLEGATIONS

**A.     Prior to the Class Period, Bank of America Appeared to be Weathering the Financial Crisis Well**

71.     Prior to the Class Period, Bank of America appeared to be in much better condition than its counterparts in the banking and financial industries in the face of the ongoing financial crisis stemming from the subprime-mortgage industry and the investment vehicles created with subprime and other high-risk mortgages.

72.     The basic premise behind the subprime-mortgage industry was that lenders weakened their underwriting standards to extend mortgage loans, at high borrower costs and interest rates, to individuals with poor credit, at higher loan-to-value ratios than a lender would offer to "prime" borrowers.

73.     Subprime loans were typically provided through unique mortgage products that were designed to provide temporarily low mortgage payments, which were subject to significant

increases over the life of the loan. Typical subprime products include adjustable-rate mortgages ("ARMs"), which provide an initial low rate that is adjusted (typically upward) after a set period of time, and interest-only mortgages, which defer payment of principal until some date in the future.

74.     In addition to subprime loans, aggressively profit-minded banks also issued highly-risky "Pay Option" or "Option Loans" to individuals with better credit ratings. These loans typically were issued at a ridiculously low "teaser" rate of less than 1%, and would soon spike up to a rate calibrated to LIBOR or some other benchmark rate. These loans allowed the borrower to make monthly payments that were *lower* than the accruing interest on the underlying loan; for the more than two-thirds of "Option" borrowers who chose this option, their principal actually *increased* during the early life of the loan – until the amount grew large enough to trigger higher payments.

75.     While subprime and "Option" loans often proved to be profitable for lenders in the short term, they carried a substantial risk for lenders that borrowers would fall behind in their payments, default on their mortgages, and possibly force the lender to foreclose on the borrower's home. The risk inherent in such loans becomes extremely heightened when home prices stagnate or decrease – as they did nationwide in 2006, 2007, and 2008.

76.     Beginning in 2005, delinquency rates on subprime loans nationwide began to rise. According to the FDIC, total subprime delinquencies rose from 10.33 percent in the fourth quarter of 2004 to 13.33 percent in the fourth quarter of 2006. Foreclosures rose from 1.47 to 2.0 percent over the same period.

77.     During the first half of 2007, lenders in the subprime market began to falter, in many cases going out of business because defaults and delinquencies on subprime loans soared at the same time that home prices fell.

78.     In broad terms, aggressive involvement in the subprime market with lax underwriting standards led to the collapse of Countrywide in the late summer and early fall of 2007.

79.     Prior to and during the collapse of the subprime market, financial institutions traded heavily in collateralized debt obligations, or CDOs. Generally speaking, CDOs are pools of bonds, loans, and other asset-backed securities. After mortgages were written, investment banks pooled them together and used the cash flows they produced to pay off mortgage-backed bonds, which were underwritten by investment banks. The mortgage bonds, in turn, were often packaged again into CDOs and sold to investors in slices. In 2006, CDOs soaked up an estimated $150 billion of mortgage-backed bonds that were sold to investors in slices. A CDO usually took several months to assemble a portfolio of bonds before it raised money from investors by issuing securities of its own. During the "ramp-up" period, CDO managers (typically big money managers) worked with a Wall Street bank to buy and collect the securities that will be bundled together. The bank often bore the risk of short-term fluctuations in prices of the bonds prior to the sale of the CDO.

80.     In broad terms, it was exposure to CDOs that led to the collapse of Bear Stearns in March of 2008, and that brought Merrill Lynch to its knees by September of 2008.

81.     Yet Bank of America, for a time, appeared to have successfully avoided the fate of Merrill Lynch, Countrywide, and other financial institutions.

82.     As Defendant Lewis stated in his introduction to the Company's Annual Report for 2007 ("2007 Annual Report"), it appeared that the Company's "diversity of income, tremendous scale and efficiency will help us weather this storm better than most ...."

83.     Indeed, Lewis noted in the 2007 Annual Report, "We escaped direct losses from subprime lending, which we had exited years ago."

84.     However, the Company did have exposure to CDOs, and, to a lesser event, structured investment vehicles (or "SIVs") – investment products that were backed in part by subprime and other high-risk loans – and this exposure led to $5.6 billion in write-downs in 2007.

85.     Even with these write-downs, however, the Company booked some $15 billion in profits in 2007, and its stock was still trading in the $40 dollar range at this time.

86.     As Lewis noted in the 2007 Annual Report:

> The good news is that our core businesses continue to execute their growth strategies in the marketplace with precision and discipline. In Global Consumer & Small Business Banking, revenue rose 6 percent for the year, and noninterest income rose 13 percent. We added more than two million net new retail checking accounts for the second year in a row, opened nearly 14 million new Card Services accounts, became a leading direct-to-consumer mortgage and home equity originator and extended our leadership in online banking and bill-pay business to lead the industry in mobile banking, with more than 600,000 active new accounts.
>
> In Global Wealth and Investment Management, revenue was up 8 percent for the year, as record brokerage income and a 26 percent increase in asset management fees produced a 10 percent rise in noninterest income. In Premier Banking & Investments (PB&I), revenue rose 9 percent on 22 percent growth in investment and brokerage services and 19 percent growth in fee-based assets.
>
> In Global Corporate & Investment Banking, net revenue from Business Lending rose 10 percent and average loans and leases rose 14 percent, demonstrating that we are making progress in deepening relationships with our commercial and corporate clients.

87.    Even in September of 2008, when other institutions such as Lehman Brothers,

Washington Mutual and Wachovia were approaching the brink of collapse, Bank of America still

appeared strong.  While the stock of these other once-mighty companies collapsed, Bank of

America stock still traded in the $25-$30 range.

88.    Bank of America's decision to acquire Merrill Lynch must be viewed against this

backdrop.

**B.    The Company Commits to the Acquisition of Merrill Lynch**

89.    On Saturday, September 13, 2008, Merrill Lynch Chief Executive Office John A.

Thain contacted Defendant Lewis to initiate discussions of the possible acquisition of Merrill

Lynch by Bank of America.

90.    Just two days later, on September 15, 2008, the Company entered into an

agreement to acquire Merrill Lynch.

91.    In the September 15, 2008 press release announcing the Acquisition (which was

attached to a Form 8-K filed with the SEC), the Company stated in pertinent part as follows:

> Bank of America Corporation today announced it has agreed to
> acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock
> transaction that creates a company unrivalled in its breadth of
> financial services and global reach.
>
> "Acquiring one of the premier wealth management, capital
> markets, and advisory companies is a great opportunity for our
> shareholders," Bank of America Chairman and Chief Executive
> Officer Ken Lewis said. "Together, our companies are more
> valuable because of the synergies in our businesses."
>
> "Merrill Lynch is a great global franchise and I look forward to
> working with Ken Lewis and our senior management teams to
> create what will be the leading financial institution in the world
> with the combination of these two firms," said John Thain,
> chairman and CEO of Merrill Lynch.
>
> Under terms of the transaction, Bank of America would exchange
> .8595 shares of Bank of America common stock for each Merrill
> Lynch common share. The price is 1.8 times stated tangible book
> value.

Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012. The acquisition is expected to be accretive to earnings by 2010.

The transaction is expected to close in the first quarter of 2009. It has been approved by directors of both companies and is subject to shareholder votes at both companies and standard regulatory approvals.

Under the agreement, three directors of Merrill Lynch will join the Bank of America Board of Directors.

The combined company would have leadership positions in retail brokerage and wealth management. By adding Merrill Lynch's more than 16,000 financial advisers, Bank of America would have the largest brokerage in the world with more than 20,000 advisers and $2.5 trillion in client assets.

\*   \*   \*   \*

Adding Merrill Lynch both enhances current strengths at Bank of America and creates new ones, particularly outside of the United States. Merrill Lynch adds strengths in global debt underwriting, global equities and global merger and acquisition advice.

After the acquisition, Bank of America would be the number one underwriter of global high yield debt, the third largest underwriter of global equity and the ninth largest adviser on global mergers and acquisitions based on pro forma first half of 2008 results.

92.    In announcing the proposed Acquisition, Defendants assured investors, including

Plan participants, that the Company had done adequate due diligence in connection with the

Acquisition.  Commenting on Bank of America's financial advisor, J.C. Flowers & Co,

Defendant Lewis stated:

J.C. Flowers or Chris Flowers is someone we've known for quite some time.  We've done several deals with him.  We know his firm very well, and it was fortunate that we did because his firm – he and his firm had done quite an amount of due diligence on Merrill Lynch fairly recently, and it was very, very extensive. They had looked at the marks very comprehensively, so this allowed us to have him and [his] team as an adviser, and just update the information they already had.  So that was one of the key ingredients to being able to do this as quickly as we did …. I will say that Chris [Flowers'] comment was 'it's night and day from the time we first looked at it to now.'  He was very complimentary of what Jon [Thain] and his team had done in terms of dramatically reducing the marks, in many cases not only – not only reducing the marks but getting rid of the assets, which is the best thing to do ….

93.   In the September 15, 2008 conference call announcing the proposed Acquisition,

Defendant Price stressed that Bank of America was familiar with the quality of Merrill Lynch's

credit because it competed with Merrill Lynch, and insisted that, though the diligence period was

short, it was comprehensive:

> Just to touch on a few other things of importance in the transaction
> before taking questions, from a risk or due diligence perspective,
> as you heard Ken say, we competed against Merrill Lynch and
> have known them well for years in addition to discussing business
> opportunities several times.  We sent in a large team to review
> areas such as asset valuations, trading positions, and the like.

> \*    \*    \*    \*

> While none us like the market turmoil we've been through in the
> last year, it has caused us all to be much more attuned to the
> quality of particular name credits and/or other assets.  So it's not as
> if we don't have a very significant knowledge of the markets
> around the asset classes that are most problematic ....

94.   On September 18, 2008, Bank of America attached the Agreement and Plan of

Merger (the "Agreement") to a Form 8-K the Company filed with the SEC.

95.   Under the Agreement, Merrill Lynch was required to fully cooperate with

Defendants and provide any information necessary in order to prepare the Proxy Statement:

> Each of Parent and Company shall, upon request, furnish to the
> other all information concerning itself, its Subsidiaries, directors,
> officers and stockholders and such other matters as may be
> reasonably necessary or advisable in connection with the Joint
> Proxy Statement, the Form S-4, or any other statement, filing,
> notice or application made by or on behalf of parent, Company or
> any of their respective Subsidiaries to any Governmental Entity in
> connection with the Merger and the other transactions
> contemplated by this Agreement.

96.   Section 6.2 of the Agreement further provided Defendants with full and complete

access to Merrill Lynch's books and records.

## C.   The Misleading Proxy Statement

97.   The terms of the Acquisition were detailed in a Proxy Statement filed with the

SEC on November 3, 2008 and mailed to all shareholders of record of Bank of America

including Plan participants.  The Proxy Statement urged all Bank of America shareholders

including Plan participants to vote in favor of the Acquisition:

> The Bank of America board of directors believes that the merger is
> in the best interest of Bank of America and its stockholders and has
> unanimously approved the merger and the merger agreement.  The
> Bank of America board of directors unanimously recommend that
> Bank of America shareholders vote "FOR" the proposal to issue
> shares of Bank of America common stock in the merger.

98.     Under the terms of the agreement, Bank of America would exchange .8595 shares

of Bank of America common stock for each Merrill Lynch common share.

99.     The Proxy Statement also included reported results with respect to Merrill

Lynch's operations for the quarter ended June 30, 2008, and discussed more recent financial

results of Merrill Lynch in a section captioned "Recent Developments."

100.     The Proxy Statement contained material misstatements and omissions that should

have been disclosed to Bank of America employees participating in the Plan in order to allow

them to decide what actions to take to guard their retirement assets.  The Proxy Statement

significantly overvalued Merrill Lynch's assets and did not accurately disclose Merrill Lynch's

financial condition to Bank of America shareholders, including Plan participants.  The Proxy

Statement did not inform Bank of America shareholders of the significant risks and liabilities

that Bank of America and its shareholders would acquire through the Acquisition.

**D.     After the Announcement of the proposed Acquisition, Defendants Remained
Positive About the Acquisition in Statements to the Market and to Employee-Plan
Participants**

101.     From the time of the announcement of the Acquisition until after its

consummation and beyond, Defendants never publicly deviated from their positive assessment of

the Acquisition and its impact on the largest single asset of the Plan, BAC stock.  That is the case

even though, as Defendants knew or should have known, Merrill Lynch's condition was far

worse than represented in the Proxy statement or known to employee-Plan participants at Bank of America, and was continuing to deteriorate.

102.    In the Company's conference call discussing its own results for Q3 2008, when an analyst asked whether "the $10 billion you're raising today, should we expect that to be that and then done or look for additional capital once the Merrill deal is closed?", Defendant Price responded:  "We have considered the Merrill deal in our intentions here so the numbers we were talking about, as I mentioned in the prepared remarks, covered our anticipated needs from a Merrill standpoint."

103.    On information and belief, Defendant Lewis continued, in his internal talking points to employee-Plan participants, to tout the strength of the Company and its stock.

104.    In a November 26, 2008 letter to employee-Plan participants, Defendant Lewis asserted that the Company was "one of the strongest and most stable major banks in the world." He claimed that the recent federal investment of $15 billion represented "funds that we did not need and did not seek."

105.    Neither the Proxy Statement, nor any statements made to employee-Plan participants from the time of the Agreement onward, disclosed the catastrophic state of Merrill Lynch's assets or the inevitability of stunning losses in the 4th quarter as a result.

106.    On December 5, 2008, Bank of America held a special meeting of shareholders, including Plan participants.  Once again, Defendants did not correct the material misstatements and omissions in the Proxy Statement, and did not disclose the continued deterioration of Merrill Lynch's financial condition after the Proxy Statement was issued but before the votes were cast. During that time, the additional billions of dollars in losses Merrill Lynch suffered massively

increased the risk that Bank of America shareholders would take on if the Acquisition were consummated.

107.     At the December 5, 2008 special meeting, 82% of Bank of America shareholders who voted approved the Acquisition and issuance of additional shares by the Company that it would use to consummate the Acquisition.

108.     According to a January 17, 2009 article in the *Wall Street Journal* captioned "Crisis on Wall Street:  Bank of America Goes on Offense – Stock Tanks on Quarterly Loss, Details of Latest Bailout; Employees Angry," *even after* the truth about the disastrous state of Merrill Lynch began to come out, the Company issued a memo to employee-Participants on January 15, 2009 titled "Bank of America Remains Strong."

109.     In the January 15 memo, Defendant Lewis told employee-Plan participants that, among other things:  "The core of our company, Bank of America, remains strong.  We are one of the world's leading financial institutions with broad earnings diversity and a large growing deposit base."  As reasons for optimism, Defendant Lewis cited increases in retail and commercial deposits, as well as the claim that Bank of America serves "one out of every two American households, helping them navigate these challenging times."  Further, Defendant Lewis stated, "We remain focused on providing associates with a great work environment, opportunities and world-class benefits. And we remain focused on delivering strong results, as we have in past decades and will in the future."

110.     Hence, even as he sat poised to deliver the news that would send BAC stock – and the Plan participants' massive holdings of the stock – into a tailspin, Defendant Lewis assured employee-Plan participants that all was well.

**E.     The Truth About Merrill Lynch Begins To Come Out, And The Plan Is Hit Hard**

111.     On November 5, 2008, BAC stock closed at $21.27.